UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS LABORERS' HEALTH & WELFARE FUND, on behalf of itself and others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>BOEHRINGER INGELHEIM PHARMACEUTICALS, INC. and BOEHRINGER INGELHEIM INTERNATIONAL GMBH,<br><br>Defendants. | Civil Action No. 24-cv-10565-DJC |

## MEMORANDUM AND ORDER

CASPER, J.                                                      March 27, 2025

### I.    Introduction

Plaintiff Massachusetts Laborers' Health & Welfare Fund ("Massachusetts Laborers") has filed this class action against Defendants Boehringer Ingelheim Pharmaceuticals, Inc. and Boehringer Ingelheim International GMBH (collectively, "Boehringer") alleging various antitrust-related violations under state law including monopolization and monopolistic scheme (Count 1 and Count 8), monopolization for wrongful Orange Book listings (Count 2 and Count 9); monopolization for sham litigation (Count 3 and Count 10), attempted monopolization and monopolistic scheme (Count 4 and Count 11), unfair methods of competition (Count 5 and Count 12), violations of state consumer protection laws for wrongful Orange Book listings (Count 6 and Count 13), violations of state consumer protection laws for sham litigation (Count 7 and Count 14) and unjust enrichment (Count 16).  D. 57.  Additionally, Massachusetts Laborers seeks injunctive

1

relief under Section 2 of the Sherman Act and Section 16 of the Clayton Act, 15 U.S.C. § 26 (Count 15).  Id.  Boehringer has moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).  D. 65.  For the reasons stated below, the Court ALLOWS the motion in part and DENIES it in part.  Id.

## II.    Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief."  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein.  Id.  Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.  Id.  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the conduct alleged." Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (citation omitted).

## III.    Factual Background

The following facts are drawn from Massachusetts Laborers' amended complaint, D. 57, and are accepted as true for the purposes of resolving Boehringer's motion to dismiss.

A.    **Regulatory Framework**

1.    **Exclusivity**

Drug makers can obtain valid patents over their prescription drug products, which provide limited protection from generic competition by other drug companies for a fixed period (often called an exclusivity period) set by Congress. D. 57 ¶ 31. A valid, enforceable patent may exclude others from making the patented invention. Id. ¶ 32. In addition, drug companies may also receive regulatory exclusivity which runs concurrently to patent exclusivity. Id. ¶ 34. Once a brand name drug maker's exclusivity period expires, the company can no longer lawfully block generic competition. Id. ¶ 37.

2.    **Orange Book**

The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*, governs the manufacture, sale, and marketing of prescription drugs in the United States. Id. ¶ 43. A drug maker seeking to market and sell a new drug must first submit a New Drug Application ("NDA"). Id. ¶ 45. The patents the applicant identifies as claiming the drug are then listed in the FDA's compendium of products and their related patents, the "Approved Drug Products with Therapeutic Equivalence Evaluation," also known as the Orange Book. Id. ¶ 10.

From 1983 until 2019, the FDCA required NDA applicants to submit "the patent number and expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug" to the FDA. Id. ¶ 56. In 1994, the FDA implemented 21 C.F.R. § 314.53, amended in 2003, to specify the types of patents that could be listed in the Orange Book. Id. ¶¶ 64, 73. The regulation specifies that an applicant may not "submit a patent

3

unless it claims a drug substance, drug product, or method of using a drug substance or drug product." Id. ¶¶ 65, 74. More recently, in 2020, Congress amended the statute by passing the Orange Book Transparency Act. Id. ¶¶ 114-15. Under this statute, NDA applicants must submit "the patent number and expiration date of each patent for which a claim of patent infringement could reasonably be asserted . . . and that (I) claims the drug for which the applicant submitted the application and is a drug substance (active ingredient) patent or a drug product (formulation or composition) patent; or (II) claims a method of using such drug for which approval is sought or has been granted in the application." Id. ¶ 115.

### 3.    The ANDA Process

Under the Hatch–Waxman Amendment to the FDCA ("Hatch–Waxman"), a generic drug manufacturer may file an Abbreviated New Drug Application ("ANDA"). Id. ¶ 50. In an ANDA, a generic drug manufacturer can establish that its product is bioequivalent[1] to the brand name drug. Id. For each patent listed in the Orange Book, the ANDA applicant must include one of four certifications, including as relevant here, paragraph III certification indicating that "[t]he would-be competitor will wait for a patent's expiration before marketing its competing product" or paragraph IV certification indicating that "[a] listed patent is 'invalid or will not be infringed by the manufacture, use, or sale' of the competitor's product." Id. ¶ 122; 21 U.S.C. § 355(j)(2)(A)(vii). If an applicant chooses to pursue a paragraph IV certification, it must notify the brand-name drug maker and provide a "detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed." Id. ¶ 124. Ordinarily,

---

[1] "Bioequivalent" means that the generic drug contains the same active ingredients in the same amount, administered in the same form, at the same strength; and is absorbed into the body in the same way, at the same rate, and to the same extent as the brand name drug. Id. ¶ 50. Drugs that are bioequivalent are also therapeutically equivalent. Id.

a patent holder must wait until a competitor "makes, uses, offers to sell, or sells" an infringing product before suing. Id. ¶ 133; 35 U.S.C. § 271(a). An ANDA containing a paragraph IV certification for one or more Orange Book-listed patents, however, provides the brand name drug maker grounds to sue without needing to wait. Id. ¶ 134. Once such a suit is filed, it imposes an automatic stay preventing the FDA from granting final approval to the ANDA until (a) the passage of thirty months or (b) a court decision ruling that the patent is invalid or not infringed by the ANDA product, whichever happens sooner. Id. ¶ 135; 21 U.S.C. § 355(j)(5)(B)(iii). If an ANDA satisfies all scientific and procedural conditions for final approval before one of those conditions occurs, the FDA may grant "tentative approval" for the ANDA. Id. ¶ 136.[2]

### B.   **Combivent Respimat and Spiriva Respimat**

Boehringer's products, Combivent Respimat and Spiriva Respimat, are both drug-device combinations. Id. ¶ 4. Combivent Respimat is a combination of two medicines: ipratropium bromide (an anticholinergic) and albuterol sulfate (a beta$_2$-adrenergic agonist). Id. It is approved for treatment of chronic obstructive pulmonary disease ("COPD") that is inadequately controlled by albuterol alone. Id. Spiriva Respimat, which contains an anticholinergic called tiotropium bromide, is approved as a once-daily maintenance treatment for the symptoms of COPD, and as a maintenance treatment for asthma in patients over five years old. Id. Both products are currently sold in Boehringer's Respimat inhaler. Id. ¶ 5.

---

[2] While the tentative approval allows a generic drug manufacturer to launch its product prior to the resolution of the patent infringement case, it does not shield that manufacturer from liability arising from same. In re Nexium (Esomeprazole) Antitrust Litig. ("Nexium I"), 42 F. Supp. 3d 231, 245 (D. Mass. 2014), aff'd, 842 F.3d 34 (1st Cir. 2016). Thus, any generic product launched prior to said resolution is "at-risk," "that is, with the risk of losing the infringement case against it hanging over its head." Id. "Losing an infringement case after launching at risk can result in significant liability for generic manufacturer, as damages typically are calibrated by the amount of its at-risk sales." Id. (citing 32 U.S.C. § 271(e)(4)(C)).

### 1. Combivent Respimat

As noted, Combivent Respimat is a combination of two active ingredients: ipratropium bromide and albuterol sulfate. Id. ¶ 174. Albuterol sulfate was patented in 1972; its patents have since expired. Id. Ipratropium bromide was introduced as a treatment for COPD two years later in 1974; its original patents have also expired. Id. In 1986, Boehringer introduced Atrovent, a drug product containing ipratropium bromide, that was covered by a patent that expired in 1991. Id. ¶ 175. In the mid-1990s, Boehringer introduced a second ipratropium-bromide containing product, Combivent. Id. ¶ 176. The FDA approved Combivent in 1996 as a combination of ipratropium bromide and albuterol in a standard inhaler. Id. Because the patents on both ipratropium bromide and albuterol had expired, Boehringer could not list any patents in the Orange Book. Id. A regulatory exclusivity protected Combivent from competition, but only until October 24, 1999. Id. Soon thereafter, Boehringer faced several generic competitors. Id.

In April 2010, the FDA announced that it had finalized a rule phasing out seven different inhaler products that contained chlorofluorocarbons ("CFCs) because CFCs are harmful to the environment. Id. ¶ 177. Under that rule, Boehringer could no longer sell its original Combivent formulation after December 31, 2013. Id. In response, Boehringer reformulated its Combivent product, replacing CFCs with hydrofluoroalkanes ("HFA"). Id. ¶ 178. In so doing, it changed the Combivent inhaler from a standard inhaler to the Respimat. Id. ¶ 179. The FDA approved Combivent Respimat on October 7, 2011. Id. ¶ 180. Because Combivent Respimat did not contain a new chemical entity, Boehringer received only a three-year regulatory exclusivity, which expired on October 7, 2014. Id.

Boehringer listed twenty-five device patents in the Orange Book claiming Combivent Respimat, only two of which reference the drugs ipratropium bromide and albuterol sulfate in the

claim. – U.S. Patent No. 6,988,496 (the "'496 patent") and U.S. Patent No. 7, 104,470 (the "'470 patent"). Id. ¶¶ 191–93. The '496 patent expired on February 23, 2020 and the '470 patent expired on October 4, 2016. Id. ¶¶ 192, 194.

### 2.    Spiriva Respimat

In January 2004, the FDA approved Boehringer's application to make Spiriva, which was the drug substance tiotropium bromide provided with a standard inhaler. Id. ¶ 187. In November 2007, Boehringer submitted an NDA to the FDA seeking to make, market, and sell Spiriva's active ingredient, tiotropium bromide, in the Respimat inhaler as a treatment for COPD. Id. ¶ 188. The FDA approved Boehringer's Spiriva Respimat application on September 24, 2014. Id. Because Spiriva Respimat did not contain a new chemical entity, the FDA granted Boehringer a three-year regulatory exclusivity, which expired on September 24, 2017. Id.

Boehringer listed nineteen device patents to the Orange Book claiming Spiriva Respimat, only three of which claim the underlying drug ingredients tiotropium bromide – the '470 patent, the '496 patent and U.S. Reissued Patent No. RE39,820 (the "'820 patent"). Id. ¶¶ 448–51. Because Boehringer tested the use of Spiriva Respimat in children in February 2017, the FDA granted it a pediatric exclusivity extension on its listed patents so the '470 and '496 patents for this drug expired on August 23, 2020. Id. ¶ 450. The '820 patent expired in 2018. Id. ¶ 451.

### 3.    The Disputed Patents

As of the filing of the amended complaint, six of the patents that do not claim the drug ingredients (the "Disputed Patents") are still in the Orange Book. Id. ¶ 16. These include U.S. Patent No. 7,284,474 (the "'474 patent"); U.S. Patent No. 7,396,341 (the "6'341 patent"); U.S. Patent No. 7,837,235 (the "'235 patent"); U.S. Patent No. 7,896,264 (the "'264 patent"); U.S. Patent No. 8,733,341 (the "3'341 patent") and U.S. Patent No. 9,027,967 (the "'967 patent"). Id.

As alleged, the Disputed Patents either claim the Respimat inhaler or a component of it.  Id. ¶¶ 9, 16.

### C.    <u>Lawsuits against Anobri</u>

In March 2023, Anobri Pharmaceuticals US, LLC (along with its parent company, Shanghai Anovent Pharmaceutical Co., Ltd. and one of Shanghai Anovent's other subsidiaries, Nanchang Anovent Pharmaceutical Co., Ltd.) (collectively, "Anobri") submitted two ANDAs to the FDA:  one for a generic version of Spiriva Respimat and one for a generic version of Combivent Respimat.  Id. ¶ 606.  Anobri filed a paragraph IV certification in both ANDAs.  Id. ¶¶ 607–08. On June 29, 2023, Boehringer sued Anobri in the U.S. District Court for the District of New Jersey, alleging, in two, separate lawsuits, that Anobri's Combivent Respimat and Spiriva Respimat ANDAs, respectively, infringed its patents.  Id. ¶ 611–12.  Anobri answered the complaints and asserted counterclaims in both cases, arguing that each of Boehringer's claims of the patents were invalid.  Id. ¶ 613.  On July 24, 2024, a stipulation was entered in which Anobri agreed to "no longer seeking FDA approval" for its ANDAs "prior to the expiration of the '474 and '264 patents" and to amend its ANDAs to re-certify them as being submitted under paragraph III.  <u>Boehringer Ingelheim Pharmaceuticals, Inc. et al. v. Anobri Pharmaceuticals U.S., LLC</u>, 23-cv-3530-CCC, D. 77 (D.N.J. 2023); D. 69 at 2-3; D. 69-1.

### IV.    **Procedural History**

Massachusetts Laborers filed this action on March 6, 2024, D. 1, and filed the amended complaint on May 9, 2024.  D. 57.  Boehringer now has moved to dismiss.  D. 65.   The Court heard the parties on the pending motion and took the matter under advisement.  D. 89, D. 90.

V.    **Discussion**

Boehringer moves to dismiss the amended complaint on several bases:  (1) that Massachusetts Laborers has failed to allege plausibly a causal relationship between Boehringer's alleged wrongful listing of the Disputed Patents in the Orange Book and Massachusetts Laborers' antitrust injury, D. 66 at 14, (2) that Massachusetts Laborers has failed to allege plausibly that Boehringer engaged in sham litigation, <u>id.</u> at 19, and (3) that Massachusetts Laborers has failed to plead many of its state law claims, <u>id.</u> at 24.  The Court address these grounds in turn below.

A.    <u>**Failure to Allege Causation**</u>

To bring an antitrust claim, a plaintiff "must not only meet the typical requirements of Article III standing, but also the requirements of the so-called 'antitrust standing' doctrine." <u>Vázquez-Ramos v. Triple-S Salud, Inc.</u>, 55 F.4th 286, 293 (1st Cir. 2022) (citing <u>Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 535 n.31 (1983)). Causation is a requisite element of antitrust standing.  <u>Id.</u> (quoting <u>RSA Media, Inc. v. AK Media Grp., Inc.</u>, 260 F.3d 10, 14 (1st Cir. 2001)).  To plead antitrust causation, "a plaintiff in an antitrust case must demonstrate that there is a causal connection between the defendant's illegal practice and the antitrust injury." <u>Amphastar Pharms., Inc. v. Momenta Pharms., Inc.</u>, 297 F. Supp. 3d 222, 228 (D. Mass. 2018) (citing <u>Sullivan v. Nat'l Football League</u>, 34 F.3d 1091, 1103 (1st Cir. 1994)). The plaintiff "need not prove that the antitrust violation was the sole cause of their injury, but only that it was a material cause." <u>Nexium I</u>, 42 F. Supp. 3d at 267 (quoting <u>Engine Specialties, Inc. v. Bombardier Ltd.</u>, 605 F.2d 1, 14 (1st Cir. 1979)).  "An antitrust violation can be the material cause – often interpreted as proximate cause – 'even if there are additional independent causes of injury.'" <u>In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.</u>, No. 14-md-02503-DJC, 2018 WL 563144, at *13 (D. Mass. Jan. 25, 2018) (quoting <u>Nexium I</u>, 42 F. Supp. 3d at 267)).

"As in tort law, a plaintiff need not 'prove a series of negatives' or 'offer evidence which positively exclude[s] every other possible cause' of the conduct." Id. (quoting In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 21, 45 (1st Cir. 2013)). "'Once a plaintiff [alleges plausibly] that he suffered the sort of injury that would be expected consequence of the defendant's wrongful conduct,' the burden shifts to the defendant to rebut this causal inference." Neurontin, 712 F.3d at 45 (quoting BCS Servs., Inc. v. Heartwood 88, LLC, 637 F.3d 750, 758 (7th Cir. 2011)).

### 1.    Patent Non-Infringement

Boehringer argues that Massachusetts Laborers cannot allege plausibly a causal link between Boehringer's alleged wrongful listing of the Disputed Patents in the Orange Book and its injury because it cannot allege that a "generic Combivent Respimat or Spiriva Respimat could have been sold without infringing Boehringer's patents." D. 66 at 15. Boehringer contends that "[b]ecause only one valid patent cuts the chain of causation, [Massachusetts Laborers] must plead facts showing 'all' of Boehringer's relevant patents are either invalid or would not be infringed by a generic." Id. at 16 (citing Mayor & City Council of Baltimore v AbbVie Inc., 42 F.4th 709, 713 (7th Cir. 2022)).

As an initial matter, another session of the Court has declined to adopt this reasoning at the pleading stage. See Iron Workers Dist. Council of New England Health & Welfare Fund v. Teva Pharm. Indus. Ltd. ("Iron Workers II"), No. 23-cv-11131-NMG, 2024 WL 4700248, at *5–*6 (D. Mass. Nov. 6, 2024)) (describing the defendant's argument that "in claims involving patented and generic versions of medical products, a plaintiff cannot properly allege causation if the patent at issue is valid"). The court there held that to the extent that courts in this Circuit have previously concluded that a plaintiff must demonstrate that a patent for a brand name drug product was invalid or would not have been infringed to establish antitrust causation, those cases "involved disputes

about causation that arose well-beyond the pleading stage" and as such their applicability is confined there. See id. at *5 (citing In re Nexium (Esomeprazole) Antitrust Litig. ("Nexium II"), 842 F.3d 34, 63 (1st Cir. 2016); Solodyn, 2018 WL 563144, at *13)). Accordingly, the court concluded that "because defendant's motion is at the pleading stage, plaintiff's allegations of antitrust standing suffice to survive judgment on the pleadings just as it survived the motion to dismiss." Id. at *6.

The same is true here. That is, Boehringer's argument is insufficient to defeat Massachusetts Laborers' antitrust standing because to plead causation, a plaintiff is only required to allege plausibly that Boehringer's alleged wrongful listing is a "material cause" of its injury, not the "sole cause" of same. Nexium I, 42 F. Supp. 3d at 267 (quoting Engine Specialties, Inc., 605 F.2d at 14). Assuming arguendo that the presence of valid patents in the Orange Book covering Combivent Respimat and Spiriva Respimat may also deter generic manufacturers from entering the market for Combivent Respimat and Spiriva Respimat, it is not ground for "dismissing the complaint now," In re Actos End-Payor Antitrust Litig., 848 F.3d 89, 101 (2d Cir. 2017) (citing Zenith Radio Corp. v. Hazeltine Rsch., Inc., 395 U.S. 100, 114 n. 9 (1969)), because the burden is not on Massachusetts Laborers to "offer evidence to positively exclude" alternative causes or any "other possible cause" of its injury. Solodyn, 2018 WL 563144, at *13 (quoting Neurontin, 712 F.3d at 45). Accordingly, to the extent that Boehringer's argument hinges on this pleading requirement, it cannot prevail.

It is correct, however, "[t]hat a regulatory or legislative bar can break the chain of causation in antitrust case is beyond fair dispute." In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class ("Wellbutrin II"), 868 F.3d 132, 165 (3d Cir. 2017). Because a "valid patent independently precludes competition apart from any agreement," it may interfere with a plaintiff's chain of

causation and in some circumstances serves "as an independent regulatory bar" to causation. Nexium II, 842 F.3d at 63 (quoting In re Wellbutrin XL Antitrust Litig. ("Wellbutrin I"), 133 F. Supp. 3d 734, 764, 767 (E.D. Pa. 2015). Whether the existence of a valid patent can break the chain of causation, however, depends on whether the causal theory asserted by the plaintiff hinges on the invalidity or non-infringement of said patent. See Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC, No. 22-cv-941-GBW, 2024 WL 2700031, at *9 (D. Del. May 24, 2024) (holding that the court will assess whether a valid and infringed patent break the causal chain "when a plaintiff argues that an allegedly blocking patent is invalid, unenforceable, or not infringed") (citing Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC, 841 F. App'x 399, 404 (3d Cir. 2021)). In third-party payors cases, as here, courts have applied this principle primarily in reverse payment cases. See e.g. Nexium II, 842 F.3d at 39; Solodyn, 2018 WL 563144, at *3–*4. "A reverse payment refers to an arrangement in which the brand-name manufacturer and patent holder compensates the generic manufacturer and alleged patent infringer to settle [a] paragraph IV litigation and delay the generic's market entry." Nexium II, 842 F.3d at 41 (citing F.T.C. v. Actavis, Inc., 570 U.S. 136, 144–145 (2013)). Because a paragraph IV infringement litigation "put the patent's validity at issue," Actavis, Inc., 570 U.S. at 147, a causal theory based on the allegation that a defendant has delayed generic entry by settling such a litigation with its generic competitors necessarily requires a plausible allegation that the patents giving rise to such suits are invalid or would not be infringed.

Nexium II is illustrative. There, the plaintiffs alleged that the defendant brand name drug manufacturer engaged in a reverse payment scheme. Nexium II, 842 F.3d at 39. As alleged, the defendant had sued the generic manufacturers after they filed a paragraph IV certification to market generic versions of defendant's brand name drug. Id. at 42–43. The plaintiffs relied upon several

causal theories, including that one of the generic manufacturers "would have incurred the risk of launching at risk," i.e. before the paragraph IV litigation has been decided, and another "would have won its paragraph IV suit against" the defendant. Id. at 62. The First Circuit reasoned that because both theories "depend[] on the theory that [the defendant's] patents were invalid or not infringed by a generic version," id. at 62, without evidence of same, "the 'patent[s] serve as an independent regulatory bar to [a generic's] launch,'" id. at 63 (alterations in original) (quoting Wellbutrin I, 133 F. Supp. 3d at 767).

Massachusetts Laborers offers two causal theories, which it refers to as the (1) "No Wrongful Listing" theory and the (2) "No Sham Litigation" theory. D. 70 at 15-16. Under the first theory, Massachusetts Laborers alleges that but for Boehringer's listing of the Disputed Patents in the Orange Book, prospective generic competitors for Combivent Respimat and Spiriva Respimat "would not have faced the regulatory barriers to market entry associated with a [p]paragraph IV certification, specifically the prospect of pre-launch patent litigation and the automatic 30-month stay of FDA approval of any ANDA" for the drugs. Id. at 16. As a result, they would have been able to enter the market in or around 2020, when the last of the patents claiming the drug ingredients in Combivent Respimat and Spiriva Respimat have expired. Id. 15-16. Under the second theory, Massachusetts Laborers alleges that but for the alleged wrongful listings,[3] Boehringer would have had no ground to file the infringement suit against Anobri and

---

[3] Recent caselaw appears to lend more support to Massachusetts Laborers' contention that Boehringer wrongfully listed the patents in the Orange Book. As requested by Massachusetts Laborers in a supplemental filing, D. 98, the Court took notice of Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of New York, LLC, 124 F.4th 898 (Fed. Cir. 2024). There, the plaintiff generic drug manufacturer alleged in its counterclaim that the counterclaim defendant brand name drug manufacturer violated antitrust laws by listing patents for its inhaler relating "to improvements in [its] device parts[.]" Id. at 908–09. The district court had "concluded that [the counterclaim defendant's] patents 'do not claim the drug for which the applicant submitted the application' and thus ordered [the counterclaim defendant] to delist its patents from the Orange

one or both of its ANDAs for Combivent Respimat and Spiriva Respimat would have been approved and the generic products of same would have entered the market sooner.  Id. at 16-17.

Here, neither theory hinges on the issue of patent invalidity or non-infringement.  Rather, each theory depends upon the assertion that Boehringer has misused Hatch-Waxman's regulatory mechanism to erect an anticompetitive barrier of entry that either directly prevents prospective generic competitors from entering the market through patent infringement lawsuits that impose a "near-automatic injunctive relief, regardless of the merits [the] infringement claims" D. 57 ¶ 147, as was initially the case for Anobri, or indirectly by deterring generic drug manufacturers from "even beginning the drug development process," id. ¶ 11. That is, without being listed in the Orange Book, the Disputed Patents would not have created a barrier of entry for Combivent Respimat and Spiriva Respimat generics because Boehringer would not be able to sue for infringement on those patents until the generic products for them have entered the market.  See Bristol-Myers Squibb Co. v. Ben Venue Lab'ys, 90 F. Supp. 2d 540, 545 (D.N.J. 2000) (explaining that "[i]n a classic patent infringement case, a patentee may sue an alleged infringer only when the defendant 'makes, uses, offers to sell, or sells' a patented invention – in other words, upon its actual entry into the market") (citing 35 U.S.C. § 271(a)).  Accordingly, whether the Disputed Patents are valid or would not be infringed by a generic product is immaterial because, as alleged, it is not their validity or non-infringement that prevent the entry of the generic products, but their inclusion in the Orange Book.  D. 70 at 15-17.

To support its argument to the contrary, Boehringer relies upon In re Humira (Adalimumab) Antitrust Litig., 465 F. Supp. 3d 811 (N.D. Ill. 2020) and the Seventh Circuit's

---

Book."  Id. at 910 (quoting Teva, 736 F. Supp. 3d at 234, 236).  The Federal Circuit affirmed, holding that that Hatch-Waxman requires brand name drug manufacturers to list only patents that "claim an invention containing the active ingredient."  Id. at 919.

affirmation in <u>AbbVie</u>, 42 F.4th at 716.  There, the defendant brand name drug manufacturer obtained 132 patents on the brand name drug at issue.  <u>Humira</u>, 465 F. Supp. 3d at 822.  As the defendant "pursued new patents, its competitors applied for FDA approval to manufacture biosimilars." <u>Id.</u> at 824.  The defendant sued these competitors for patent infringement, then settled with them.  <u>Id.</u> at 824–25.  The plaintiffs alleged that antitrust causation was shown because, among other reasons, "if the biosimilar manufacturers had pursued the underlying infringement suits, they could have prevailed" and entered the market sooner.  <u>Id.</u> at 843.  Because the plaintiffs asserted a causal theory premised on the biosimilar manufacturers' potential victory in the infringement suits, "it only takes one valid, infringed patent" to undermine it.  <u>Id.</u> at 844  (citing <u>Wellbutrin II</u>, 868 F.3d at 165).  Given that this is not the causal theory offered by Massachusetts Laborers, the case has limited applicability here.

## 2.    Intent and Preparedness to Enter the Market

Next, Boehringer argues that antitrust causation is not met because "to meet its burden, [Massachusetts Laborers] 'must plead that [a generic competitor] intends to enter the market, that it is prepared to enter the market, and that it would have entered the market by now but for [Boehringer] conduct.'"  D. 66 at 18 (some alterations in original) (quoting <u>Aventis Pharma S.A. v. Amphastar Pharms., Inc.</u>, 03-cv-00887-MRP-PLA, 2009 WL 8727693, at *14 (C.D. Cal. Feb. 17, 2009)).  Boehringer acknowledges that Massachusetts Laborers has identified a potential generic entrant, Anobri, which had filed ANDAs for both Combivent Respimat and Spiriva Respimat.  <u>Id.</u>  Boehringer contends, however, that Massachusetts Laborers has failed to adequately plead this element because "[t]he complaint says nothing about Anobri, its background or experience in inhaler products or COPD, its financial capacity to enter, any steps it has taken to manufacture a generic version of either product, or any other facts that show it would compete

in any relevant markets." Id. (citing Hecht v. Pro-Football, Inc., 570 F.2d 982, 994 (D.C. Cir. 1977)).

"[I]n assessing the standing of would-be market entrants, courts assess the 'intent and preparedness' of the prospective entrant." Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island, 997 F. Supp. 2d 142, 158 (D.R.I. 2014) (quoting Huron Valley Hosp., Inc. v. City of Pontiac, 666 F.2d 1029, 1033 (6th Cir.1981)). An entrant's "[i]ndicia of preparedness" may include "adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantive affirmative steps toward entry, such as the consummation of relevant contracts and procurement of necessary facilities and equipment." Id. (alteration in original) (quoting Andrx Pharm., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 807 (D.C. Cir. 2001)). In examining intent and preparedness courts should take a flexible and holistic approach, taking into account the reality of "the market from which [the plaintiff] alleges [the entrant] was excluded." Andrx Pharms. Inc., 256 F.3d at 807.

Here, the allegedly relevant markets include "the ipratropium bromide-albuterol sulfate HFA inhalation spray market (consisting of Combivent Respimat and its AB-rated generics"[4]) and "the tiotropium inhalation spray market (consisting of Spiriva Respimat and its AB-rated generics)," D. 57 ¶¶ 649, 662. Both are regulated under the regulatory framework set out by Hatch-Waxman requiring generic drug manufacturers to submit an ANDA to enter the market for a brand name product. See id. ¶ 50. As clarified by Massachusetts Laborers' counsel at the motion hearing, the preparation of an ANDA is a laborious process, requiring Anobri to "develop a product, perform testing [and] submit those materials to the FDA" to represent that its products

---

[4] "AB-rated" generics are generic drugs that are the bioequivalent to the brand name drug. D. 57 ¶ 51.

will not infringe Boehringer's patents.  D. 90 at 18.  Not only did Anobri undergo this process, but when sued by Boehringer for patent infringement, it initially defended against the lawsuit.  See generally Boehringer Ingelheim Pharmaceuticals, Inc. et al. v. Anobri Pharmaceuticals U.S., LLC, 23-cv-3530-CCC (D.N.J. 2023).  Given these allegations, additional allegations are not required at this stage.  Indeed, courts have held that a plaintiff may adequately plead "intent and preparedness" even in instances where the identified generic entrants did not have pending ANDAs.  See In re Asacol Antitrust Litig., 323 F.R.D. 451, 488 (D. Mass. 2017), rev'd and remanded on other grounds, 907 F.3d 42 (1st Cir. 2018) (noting that plaintiffs have "plausibly allege an injury in the form of lost money fairly traceable to an allegedly unlawful supra-competitive price"); Xechem, Inc. v. Bristol-Myers Squibb Co., 274 F. Supp. 2d 937, 943 (N.D. Ill. 2003), rev'd and remanded, 372 F.3d 899, 902 (7th Cir. 2004) (reversing dismissal of complaint and declining to affirm dismissal on the alternative ground that plaintiff had not shown injury even when it had not yet filed an ANDA).  Accordingly, Massachusetts Laborers' allegations that Anobri had filed the ANDAs for Combivent Respimat and Spiriva Respimat are sufficient to permit a plausible conclusion that the company had the "intent and preparedness" to enter the generic market for those drugs.  See Glaxo Grp. Ltd. v. Apotex, Inc., 130 F. Supp. 2d 1006, 1007 (N.D. Ill. 2001) (citing Glaxo, Inc. v. Novopharm, Ltd., 110 F.3d 1562, 1570–71 (Fed. Cir. 1997)) (explaining, in the declaratory judgment context, that the defendant's filing of the ANDA "means that defendant is ready or has at least made meaningful preparations to be ready to market the allegedly infringing product").[5]

---

[5]  To the extent that Boehringer relies upon Aventis Pharm., 2009 WL 8727693, at *15 to suggest that a greater showing of intent and preparedness is required, the Court does not conclude that the case stands for that proposition where the Court was faulting the drug manufacturer (not a third-party as Massachusetts Laborers is here) for alleging sufficient facts that were "within [its] knowledge."

17

Additionally, Boehringer also argues that Massachusetts Laborers has failed to plead "intent and preparedness" because it has not alleged that Anobri was prepared to launch "'at-risk' in the face of Boehringer's patents if they were not listed in the Orange Book." D. 66 at 18 (citing Wellbutrin I, 133 F. Supp. 3d at 765). As discussed above, if the patents at issue were never listed in the Orange Book, Anobri would not need to submit a paragraph IV certification for its ANDAs which means Boehringer would not have been able to sue Anobri for patent infringement until it has launched its generic versions of Combivent Respimat and Spiriva Respimat. See Bristol-Myers Squibb Co., 90 F. Supp. 2d at 545. There would not be an at-risk launch in such a scenario.

### 3.    Lack of FDA Approval

Boehringer also argues that Massachusetts Laborers has failed to plead causation because it has not alleged that Anobri had obtained a tentative approval from the FDA to enter the generic market for Combivent Respimat and Spiriva Respimat. D. 66 at 19. Boehringer argues that Anobri's failure to obtain tentative FDA approval is both indicative of a lack of "intent and preparedness" and importantly serves as an independent bar to causation. D. 78 at 6, 13. To the extent that this argument is tied to "intent and preparedness," it is unavailing for the same reasons discussed above.

Several courts have addressed tentative FDA approval for pleading antitrust causation. See, e.g., Andrx Pharms., Inc. 256 F.3d at 808 (holding that the generic drug manufacturer could have "alleged its intent and preparedness to enter the market by claiming that FDA approval was probable" and, therefore, dismissal of counterclaim with prejudice was erroneously granted) with Bristol-Myers Squibb Co., 90 F. Supp. 2d at 545 (declining to tie antitrust standing to a decision by the FDA to grant conditional approval to an ANDA). There is little relevant authority to suggest, however, that the lack of FDA approval is an "independent bar" to causation. "Were the

[C]ourt to accept [Boehringer]'s position, antitrust standing under Hatch-Waxman Act would be wholly contingent on the vagaries of the timing of agency action." Id. "If the FDA acted immediately to grant [tentative] approval to an ANDA, the generic applicant would have standing to bring antitrust claims. But if . . . the [brand name drug maker] beat the applicant to the punch by filing an [infringement claim] before FDA approval, the generic maker would be denied antitrust standing." Id. Given that the purpose of allowing a brand name drug maker to sue when a generic competitor files an ANDA is to "quickly resolve competing claims in court, before [the generic] competitors make inroads into the market, . . . [s]uch an anomalous and arbitrary result [cannot be] intended by the statute." Id.

Boehringer's support for its position comes principally from In re Terazosin Hydrochloride Antitrust Lit., 335 F. Supp 1336 (S.D. Fla. 2004); In re Relafen Antitrust Litig., 286 F. Supp. 2d 56 (D. Mass. 2003) and Bristol-Myers Squibb Co. v. Copley Pharm., Inc., 144 F. Supp. 2d 21 (D. Mass. 2000). As an initial matter, Relafen is inapplicable. In that case, the plaintiffs, a group of third-party payors, argued that generic alternatives would have become available earlier but for the defendant brand name drug manufacturer's filing of paragraph IV patent infringement lawsuits. Relafen, 286 F. Supp. 2d at 60-61. Boehringer cites a discussion in the case where the court noted that any damages that flowed from the defendant lawsuit was "entirely speculative" because "no generic-producing competitor had yet received FDA approval." Id. at 63. This discussion was limited, however, to the issue of speculative damages exception to the federal statute of limitations whereby courts will set the date of accrual on the date the plaintiff suffers an injury if "the damages flowing from conduct violating the antitrust laws are uncertain at the time the defendant engages in the conduct." Id.

Bristol-Myers and Terazosin appear to hold that a lack of tentative FDA approval can serve as an independent bar to antitrust causation.  See Terazosin, 335 F. Supp. 2d at 1368; Bristol-Myers, 144 F. Supp. 2d at 23-25.  Other courts, however, have declined to adopt these holdings.  See e.g. Andrx Pharms., 256 F.3d at 808 (holding that the generic drug manufacturer could allege "its intent and preparedness to enter the market" even before the FDA approved its ANDA "by claiming that FDA approval was probable"); Amgen, Inc. v. F. Hoffmann-La Roche Ltd., 480 F. Supp. 2d 462, 468-69 (D. Mass. 2007) (clarifying that FDA approval is not an independent bar to causation).  Amgen is particularly relevant as it clarified Bristol-Myers, a case that Boehringer relies upon extensively.  There, the Court explained that Bristol-Myers's holding was based upon the district court's holding in Andrx Pharms., Inc. v. Friedman, 83 F. Supp. 2d 179 (D.D.C. 2000) where the court "appeared to state a broad rule that FDA approval is a necessary requisite to antitrust standing."  Amgen, 480 F. Supp. 2d at 468.  The Court noted that this holding was no longer applicable, however, because the D.C. Circuit had clarified that "anticipation of FDA approval," even without the approval, "may suffice . . . since all that is necessary is demonstration of intent and preparedness to enter the market."  Id. (citing Andrx Pharms, 256 F.3d at 806-08).

For the foregoing reasons, the Court denies Boehringer's motion to dismiss the amended complaint for failure to plead causation.

### B.    Sham Litigation

Massachusetts Laborers alleges that Boehringer's lawsuit against Anobri amount to "sham litigation" because "[a] reasonable drug company in Boehringer's position would have known they did not have standing to sue Anobri for infringing Boehringer's device patents."  D. 57 ¶ 619.  "That is because Boehringer's standing is founded on having listed its device patents in the Orange Book – listings that a reasonable brand-name drug company in Boehringer's position would have

known were improper." Id. Boehringer argues that its suit against Anobri was not a sham because (1) Orange Book listings are not necessary for its standing and (2) its suits against Anobri were protected petitioning activities under Noerr-Pennington. D. 66 at 20-21.

### 1.    Standing

Boehringer contends that its standing to sue Anobri did not "depend on the Orange Book at all – rather, Boehringer had standing because it alleged the ANDAs infringed its patents." D. 66 at 20. As explained, under the normal operation of patent laws, a patentee may only sue an alleged infringer after the allegedly infringing product has entered the market. See Bristol-Myers Squibb Co., 90 F. Supp. 2d at 545 (citing 35 U.S.C. § 271(a)). Because Anobri's ANDAs for Combivent Respimat and Spiriva Respimat were not approved and its generic versions of same had not entered the market when it was sued, D. 57 ¶¶ 611–12, Massachusetts Laborers is correct to allege that Boehringer's standing to sue is "founded on having listed" its patents in the Orange Book. D. 57 ¶ 619.

### 2.    *Noerr-Pennington*

Boehringer next argues that its suits against Anobri are protected under Noerr Pennington. D. 66 at 21. "A party petitioning the government for redress is 'generally immune from antitrust liability.'" Iron Workers Dist. Council of New England Health & Welfare Fund v. Teva Pharm. Indus. Ltd ("Iron Workers I")., 734 F. Supp. 3d 145, 159 (D. Mass. 2024) (quoting Prof'l Real Estate Investors, Inc. ("PREI") v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56 (1993)). This protection "does not . . . cover 'sham' activities or lawsuits." Id. (citing PREI, 508 U.S. at 56). To determine whether a lawsuit is a sham, the Court must first examine whether the lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v.

21

Novartis Pharms. Corp., 902 F.3d 1, 13 (1st Cir. 2018) (quoting PREI, 508 U.S. at 60). "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail." PREI, 508 U.S. at 60. "If the challenged suit is objectively baseless, [the Court] then proceeds to consider the alleged monopolist's 'subjective motivation under the second part of the test.'" United Food, 902 F.3d at 13 (quoting PREI, 508 U.S. at 60). "Under this second prong, the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationship of a competitor's through the use [of] the governmental process – as opposed to the outcome of that process – as an anticompetitive weapon.'" Id. (quoting PREI, 508 U.S. at 60-61) (some quotation marks omitted) (alteration and emphasis in original). To prevail, "a plaintiff must allege that both prongs of the test are met." Id.

### 1. Objectively Baseless

The Court cannot say that Boehringer's lawsuits against Anobri were objectively baseless. As an initial matter, the Court takes judicial notice of the fact that Anobri has settled with Boehringer and agreed to that it has removed the Paragraph IV certifications and "is no longer seeking FDA approval of [ANDAs] with respect to the '474 and '264 patents." D. 69-1 at 2; D. 69 at 5; see Boehringer Ingelheim Pharmaceuticals, Inc. et al. v. Anobri Pharmaceuticals U.S., LLC, 23-cv-3530-CCC, D. 77 (D.N.J. 2023). These terms are favorable to Boehringer and, at a minimum, as such suggest that the infringement suits are not objectively baseless. Fed. Trade Comm'n v. AbbVie Inc, 976 F.3d 327, 367 (3d Cir. 2020) (citations omitted) (stating that "ordinarily, settlement on terms favorable to a plaintiff suggests a suit is not objectively baseless" but that even when it is favorable, it is "not dispositive" about the issue).

Even putting that settlement aside, the amended complaint does not contain sufficient, factual allegations to support an inference of objective baselessness.  Massachusetts Laborers alleges that Boehringer's suits are objectively baseless because no reasonable pharmaceutical company in Boehringer's position should have believed that it had the ability to sue Anobri.  D. 57 ¶¶ 614-18.  Massachusetts Laborers' claim is grounded in its interpretation of Hatch-Waxman and accompanying regulations as requiring each patent listed in the Orange Book to claim the drug's active ingredient.  D. 57 ¶ 117.  To prevail on a showing of the objective baselessness of the lawsuits, Massachusetts Laborers must allege plausibly that this requirement is so unambiguous that "no reasonable litigant" in Boehringer's position could "realistically expect success on the merits" for infringement claims based on patents listed in the Orange Book that do not claim a drug's active ingredient.  United Foods, 902 F.3d at 13 (quoting PREI, 508 U.S. at 60).

Massachusetts Laborers argues that there should be no uncertainty on how the statute should be interpreted given the clear language in both the statute and regulations, D. 70 at 27. Neither the statute nor regulations, however, unambiguously limits patents listed in the Orange Book to only those claiming drug's active ingredients.  D. 57 ¶ 117.  Pursuant to FDCA, a patent listed in the Orange Book must "1) 'claim[] the drug for which the applicant submitted the application;' and 2) the patent must be directed to a drug substance or a drug product."  Teva Branded Pharm. Prod. R&D, Inc. v. Amneal Pharms. of New York, LLC, 736 F. Supp. 3d 227, 234 (D.N.J. 2024) (alteration in original) (citing 21 U.S.C. § 355(b)(1)(A)(viii)(I)), aff'd, 124 F.4th 898 (Fed. Cir. 2024).  The term "drug" means, among other things, an "article[] intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals," id. (quoting 21 U.S.C. § 321(g)(1)) which, as Teva noted, includes inhalers, id. at 235.  The phrase "drug product" is defined to mean "a finished dosage form, e.g., tablet, capsule, or solution, that

contains a drug substance, generally, but not necessarily, in association with one or more ingredients." 21 C.F.R. § 314.3(b). The regulation further defines "dosage form" as "the physical manifestation containing the active and inactive ingredients that delivers a dose of the drug product." Id. Because neither the statute nor regulation unambiguously requires a company to list only patents claiming the drug ingredients in the Orange Book, D. 57 ¶ 117, an objective litigant in Boehringer's position could reasonably believe that it had standing to challenge Anobri and succeed "on the merits." United Foods, 902 F.3d at 13 (quoting PREI, 508 U.S. at 60).

Massachusetts Laborers also alleges that In re Lantus Direct Purchaser Antitrust Litig., 950 F.3d 1 (1st Cir. 2020), should have notified Boehringer that it lacked standing to challenge Anobri. D. 57 ¶ 633. This argument is similarly unavailing. First, Lantus was not binding authority in the Anobri litigation because the suits were filed in outside of this Circuit and because they were patent infringement suits, D. 57 ¶¶ 611–12, and as such were mainly bound by Federal Circuit precedents.[6] See Wang Lab'ys, Inc. v. Applied Computer Scis., Inc., 926 F.2d 92, 94 (1st Cir.

---

[6] To the extent that Massachusetts Laborers relies upon the recent decision, Teva Branded Pharm. Prods. R&D, Inc., 124 F.4th at 919, to support its argument that Boehringer's lawsuits were objectively baseless, the timing of that decision makes it challenging to do so. Although the Federal Circuit's holding appears to confirm Massachusetts Laborers' interpretation of Hatch-Waxman, it was decided after Boehringer had already filed its patent infringement suits against Anobri, D. 57 ¶¶ 611–12.

It also does not lend support to Massachusetts Laborers' claim that Boehringer's suit against Anobri also qualify for the Walker Process fraud exception to Noerr-Pennington. D. 70 at 28. The exception "allows for a plaintiff to bring an antitrust suit against a defendant when that defendant fraudulently obtains its patent and seeks to maintain a monopoly over a product by bringing patent infringement suits against competitors based on that fraudulently-obtained patent." Jazz, 2024 WL 2700031, at *6 (citing Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 176–77 (1965)). Like any fraud claim, to invoke the Walker Process fraud exception Massachusetts Laborers must allege plausibly that Boehringer acted with "the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent[]." Metris U.S.A., Inc. v. Faro Techs., Inc., 882 F. Supp. 2d 160, 174 (D. Mass. 2011) (quoting Hydril Co. LP v. Grant Prideco LP, 474 F.3d 1344, 1349 (Fed. Cir. 2007)). Massachusetts Laborers, however, has not made any additional allegations to permit an

1991) (noting that the Federal Circuit has exclusive jurisdiction over district court cases involving patent disputes).

Second, contrary to Massachusetts Laborers' assertion, Lantus does not unambiguously interpret Hatch-Waxman as requiring patents listed in the Orange Book to claim drug ingredients. In Lantus, the plaintiffs, similar to this case, alleged that the defendant brand name drug manufacturer had "artificially restricted competition in the market for insulin glargine" by improperly listing a patent that did not claim "insulin glargine or any method of using it." Lantus, 950 F.3d at 6-7. The defendant argued that the listing was proper because the product at issue, an injector pen device, qualifies as drug product "because it is a 'finished dosage form[.]'" Id. at 7. The court reasoned that although there was some support for the defendant's position, id. at 7, the disputed patent should not have been listed in the Orange Book because it does not claim either the drug ingredients or the injector pen itself but only a "drive mechanism" inside the pen, id. at 6, 8–10. Here, even assuming *arguendo* that Lantus applies, since the Disputed Patents claim the Respimat inhaler, D. 57 ¶ 9, Boehringer could reasonably believe that it had standing to challenge Anobri and succeed on the merits of its infringement claims.[7]

---

inference that Boehringer knew that its listing was improper, much less that Boehringer acted with the "intent to deceive." Metris, 882 F. Supp. 2d at 174 (quoting Hydril Co. LP, 474 F.3d at 1349). To the extent that this argument is based on Massachusetts Laborers' assertion that Boehringer should have known that it lacked standing to sue Anobri, it fails for the same reasons discussed above.

[7] Since the Court concludes that the first prong under Noerr-Pennington is satisfied, the Court does not need to reach the second prong about subjective motivation. PREI, 508 U.S. at 60 (noting that "[i]f an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail").

For the reasons stated above, Massachusetts Laborers has failed to allege plausibly that Boehringer had engaged in sham litigation. Accordingly, the Court allows the motion to dismiss as to Massachusetts Laborers' sham litigation claims.

### C.    Failure to Plead State Law Claims

#### 1.    Antitrust claims

Boehringer argues that Massachusetts Laborers has failed to plead its antitrust state law claims for three reasons. First, Boehringer argues that the antitrust claims asserted under the laws of Illinois, Montana and New Jersey should be dismissed because, under these laws, indirect purchasers like Massachusetts Laborers are barred from bringing antitrust class actions claims. D. 66 at 25. Generally, "only direct purchasers of goods produced by firms engaged in anticompetitive conduct could be regarded as injured within the meaning of the Clayton Act." In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. 14–md–02503–DJC, 2015 WL 5458570, at *15 (D. Mass. Sept. 16, 2015) (citing Illinois Brick Co. v. Illinois, 431 U.S. 720, 746–47 (1977)). "While some states have passed laws known as 'Illinois Brick-repealers' which expressly grant [indirect purchasers] the right to sue for antitrust violations, '[indirect purchasers] cannot assert antitrust claims under the law of states which have not passed such laws.'" Id. (quoting In re Nexium (Esomeprazole) Antitrust Litig. ("Nexium"), 968 F. Supp. 2d 367, 409 (D. Mass. 2013)).

#### a.  Illinois, Montana and New Jersey

*Illinois.* Under the Illinois Antitrust Act ("IAA"), "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General." 740 Ill. Comp. Stat. § 10/07 (2010). Relying upon the Supreme Court's holding in Shady Grove Orthopedic Assocs., P.A. v. Allstate

Ins., 559 U.S. 393 (2010), Massachusetts Laborers argues that the IAA does not prohibit indirect purchasers from bringing class actions in federal courts because it is preempted by Fed. R. Civ. P. 23.  D. 70 at 29 (citing Shady Grove Orthopedic Assocs, 559 U.S. at 407).  In Nexium, the court explained the Supreme Court in Shady Grove has held that Rule 23 preempted a "New York procedural law governing the prerequisites for class action" because that law "purported to govern procedure" and since "federal procedural rules apply in federal court . . . where state laws conflict with Rule 23, Rule 23 governs."  Nexium, 968 F. Supp. 2d at 408 (citing Shady Grove, 559 U.S. at 399).  The court noted, however, that Shady Grove is inapplicable to the IAA because unlike the aforementioned New York law, the statute is "contained in the state's antitrust statute, which confers substantive rights upon its citizens." Id. at 409.  Because the IAA is a substantive law, the court concluded that Shady Grove's holding was inapplicable and held that Rule 23 does not preempt the statute.  Id.  Accordingly, given that Rule 23 does not preempt the IAA, the Court allows the motion to dismiss as to the antitrust claims raised under Illinois law.

*Montana.*  The Montana's Unfair Trade Practices Act ("MUTPA") prohibits unlawful restraint of trade and anticompetitive conduct.  Mont. Code Ann. § 30-14-205.  The statute provides that "[a] person who is or will be injured . . . may bring an action to enjoin an act" that is in violation of the statute. Id. § 30-14-222(1).  The term "person" is defined to include "any person, partnership, firm, corporation, joint-stock company, or other association engaged in business within [Montana]." Id.  § 30-14-202(7).  Noting the plain language of the statute, as well as Montana's strong policy favoring access to the courts, a state court has held that "Illinois Brick rule does not apply to the [MPTA]." Olson v. Microsoft Corp., No. CDV-2000-219, 2001 WL 36083237, at *1 (Mont. Dist. Feb. 15, 2001).  Relying on this holding, this Court has likewise declined to apply the Illinois Brick rule to the MUPTA.  See In re Asacol Antitrust Litig., No. 15-

cv-12730-DJC, 2016 WL 4083333, at *13 (D. Mass. July 20, 2016) (citing <u>Olson</u>, 2001 WL 36083237, at *1).  Accordingly, the Court denies the motion to dismiss antitrust claims raised under Montana law.

*New Jersey*.  Under the recently amended New Jersey Antitrust Act ("NJAA"), "any person who shall be injured in his business or property by reason of anticompetitive conduct . . . may sue." N.J. Stat. Ann. § 56:9-12(a).  The statute further states that "the fact that . . . any person who has sustained damages . . . has not dealt directly with the defendant shall not bar or otherwise limit recovery."  <u>Id.</u> § 56:9-12(c).  The language specifically contemplates indirect purchasers, noting that in cases where "claims are asserted against a defendant by both direct and indirect purchasers, the court may take such steps as the court deems appropriate to avoid duplicate recovery of damages."  <u>Id.</u>  Accordingly, the Court denies the motion to dismiss as to the antitrust claims under New Jersey law.

### b.  Massachusetts and Mississippi

Second, Boehringer argues that Massachusetts Laborers has failed to state a claim under Massachusetts and Mississippi's antitrust laws because it has not alleged any "wholly intrastate conduct by Boehringer" in these states.  D. 66 at 25.

*Massachusetts*.  Under Massachusetts law, any person injured by unfair or deceptive practices may bring suit.  Mass. Gen. L. c. 93A, §§ 9, 11.  Whether said person must allege a wholly intrastate conduct depends on whether the claim is raised under Section 9 or 11 of the statute.  <u>See</u> <u>Iron Workers I</u>, 734 F. Supp. 3d at 162 (quoting <u>Fishman Transducers, Inc. v. Paul</u>, 684 F.3d 187, 197 (1st Cir. 2012)).  "Section 9 of that statute provides a cause of action for individual consumers who have suffered a loss due to an unfair trade practice whereas section 11 pertains to persons acting in a business context."  <u>Id.</u> (citing <u>In re Pharm. Indus. Average</u>

Wholesale Price Litig. ("PIAWP"), 582 F.3d 156, 191 (1st Cir. 2009)).  "Unlike actions pursuant to section 9, section 11 claims must concern conduct that occurred 'primarily and substantially' within the Commonwealth."  Id. (quoting Fishman Transducers, Inc., 684 F.3d at 197).

"Although the 'dividing line between a consumer claim and a business claim . . . is not always clear,' it 'appears to turn on whether a given party has undertaken the transaction in question for business reasons or has engaged in it for purely personal reasons (such as the purchase of an item for personal use).'"  Asacol, 2016 WL 4083333, at *13 (alterations in original) (quoting Frullo v. Landenberger, 61 Mass. App. Ct. 814, 821 (2004)).  Here, Massachusetts Laborers "cannot bring a claim under [Section 9 as [it] cannot [plausibly allege] that [it] undertook the relevant transactions," namely the purchasing and/or reimbursement for purchases of Combivent Respimat and Spiriva Respimat on behalf of its members, D. 57 ¶ 21, "for purely personal reasons." Asacol, 2016 WL 4083333, at *3 (quoting Frullo, 61 Mass. App. Ct. at 821).  Accordingly, Massachusetts Laborers may only bring its claim under Section 11, which requires it to allege plausibly that Boehringer's alleged misconduct occurred "primarily and substantially" within Massachusetts.  PIAWP, 582 F.3d at 194 (quoting Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 483 Mass. 459, 781 (2003)).  Because Massachusetts Laborers has not done so here, the Court allows the motion to dismiss as to antitrust claims raised under Massachusetts law.

*Mississippi.*  In State ex rel. Fitch v. Yazaki N. Am., Inc., the court held that a party raising a suit under the Mississippi Antitrust Act ("MAA"), Miss. Code. Ann. § 75-21-1 *et seq*., must allege a wholly intrastate conduct.  State ex rel. Fitch v. Yazaki N. Am., Inc., 294 So. 3d 1178, 1190 (Miss. 2020).  In so holding, the court rejected the state's argument that it has satisfied this requirement by alleging that the defendant engaged in intrastate commerce in Mississippi through its interstate commercial activities.  Id. at 1188–90.  Here, because Massachusetts Laborers has

not alleged that Boehringer's alleged antitrust activities occurred wholly within Mississippi, the Court allows the motion to dismiss as to antitrust claims raised under Mississippi law.

c.   Utah

Boehringer argues that Massachusetts Laborers cannot state a claim under Utah law because it is not a citizen or resident of Utah.  D. 66 at 25.  The Utah Antitrust Act ("UAA") allows "[a] person who is a citizen . . . or a resident of [Utah] who is injured or is threatened with injury in his business or property by violation of the [UAA] may bring an action for injunctive relief and damages."  Utah Code Ann. 1953 § 76-10-3109(1)(a).  This requirement also applies to indirect purchasers.  In re Liquid Aluminum Sulfate Antitrust Litig., No. 16-cv-2687-MD-JLL, 2017 WL 3131977, at *28 (D.N.J. July 20, 2017) (citing Utah Code Ann. 1953 § 76-10-3109(1)(a)).

Massachusetts Laborers argues that it has fulfilled this requirement by alleging that some members of the class made purchases in Utah which "presumably include Utah citizens and residents."  D. 70 at 30.  Although a minority of courts have held that the UAA's citizenship or residency requirement may be satisfied in a class action because members of the putative class "presumably include citizens and residents of Utah," most courts have held that "UAA claims must be dismissed if the only named plaintiffs do not allege that they are citizens or residents of Utah." In re Amitiza Antitrust Litig., No. 21-cv-11057-MJJ, 2024 WL 4250224, at *13 (D. Mass. Aug. 21, 2024) (citing Blue Cross & Blue Shield of Vermont v. Teva Pharm. Indus., Ltd., 712 F. Supp. 3d 499, 549 (D. Vt. 2024) and other cases), report and recommendation adopted as modified, No. 21-cv-11057-MJJ, 2024 WL 4344887 (D. Mass. Sept. 30, 2024).

 Here, given that the UAA's text indicates that only a person who is the citizen or resident may bring suit under the UAA, see Utah Code Ann. 1953 § 76-10-3109(1)(a), the majority's reasoning is more persuasive.  Accordingly, because Massachusetts Laborers has not plausibly

30

alleged that it is a citizen or resident of Utah, the Court allows the motion to dismiss as to the antitrust claims raised under Utah law.

### 2. Consumer Protection Claims

Boehringer raises three grounds to dismiss Massachusetts Laborers' consumer protection claims. First, Boehringer argues that the consumer protection statutes of Arkansas, Illinois, Maryland and Utah do not apply in an antitrust context. D. 66 at 25. Second, Boehringer also argues that the consumer protection statutes of New Jersey and Oklahoma do not provide for consumer protection claims based on antitrust allegations by indirect purchasers. Id. Third, Boehringer argues that Massachusetts consumer protection law does not apply to indirect purchaser antitrust claims. Id. Lastly, Boehringer contends that Massachusetts Laborers cannot raise a consumer protection claim under Indiana, Maryland, South Dakota, Vermont and Wyoming laws because "it has not alleged that it *relied* on some statement or conduct by Boehringer, as is [allegedly] required under these state laws." Id at 25-26 (emphasis in original).

#### a. *Arkansas, Illinois, Maryland and Utah*

*Arkansas.* The Arkansas Deceptive Trade Practices Act ("ADTPA") broadly prohibits "deceptive and unconscionable trade practices." Ark. Code Ann. § 4-88-107(a). Most courts have construed the statute's language to include anticompetitive conduct. See Iron Workers I, 734 F. Supp. 3d at 163 (citing In re Packaged Seafood Prods. Antitrust Litig., 242 F. Supp. 3d 1033, 1072 (S. D. Cal. 2017)) (noting that "the Arkansas Supreme Court has held that the [statute's] proscription of 'unconscionable' trade practices is broad and that the statute is to be broadly construed"); In re Pork Antitrust Litig., 495 F. Supp. 3d 753, 780–81 (D. Minn. 2020) (holding that the ADTPA applies to anticompetitive behavior). Although the ADTPA allows private individuals injured by the deceptive or unconscionable trade practices to bring suit, Ark. Code

Ann. § 4-88-113(f)(1)(A), it bars private class actions "unless the claim is being asserted for a violation of Arkansas Constitution, Amendment 89," id. § 4-88-113(f)(1)(B).  Here, Massachusetts Laborers is bringing a class action that does not assert any violation of the Arkansas Constitution. Accordingly, the motion to dismiss is allowed as to consumer protection claims raised under Arkansas law.

*Illinois.*  The Supreme Court of Illinois has held that under the Illinois Consumer Fraud and Deceptive Businesses Practices Act ("ICFA"), 815 Ill. Comp. Stat. § 505/1 *et seq.*, a plaintiff may not "state a cause of action that [is] a typical antitrust allegation under the ICFA, where the legislature had declined to include such cause of action under the [IAA]."  In re Flonase Antitrust Litig., 692 F. Supp. 2d 524, 538 (E.D. Pa. 2010) (citing Laughlin v. Evanston Hosp., 133 Ill. 2d 374, 391 (1990)).  Thus, a plaintiff may raise an antitrust claim under the ICFA only if the claim would be viable under the IAA.  See Iron Workers I, 734 F. Supp. 3d at 163 (denying a motion to dismiss because "[n]either party ha[d] addressed whether the antitrust claims at issue are actionable under the [IAA]").  Here, as discussed, Massachusetts Laborers cannot bring an antitrust action under the IAA where indirect purchasers are prohibited from bringing such an action under that statute.  See Solodyn, 2015 WL 5458570, at *16 (citing 740 Ill. Comp. Stat. § 10/7 (2010)). Accordingly, Massachusetts Laborers cannot now bring an identical claim under the ICFA.  The Court allows the motion to dismiss as to consumer protection claims brought under Illinois law.

*Maryland.*  The Maryland Consumer Protection Act ("MCPA") "forbids any 'unfair or deceptive trade practice,'" and includes a "nonexclusive list of prohibited acts."  In re New Motor Vehicles Canadian Exp. Antitrust Litig., 350 F. Supp. 2d 160, 187 (D. Me. 2004) (quoting Md. Code Ann., Com. Law, §§ 13-301, 13-303).  Because Maryland "has separate statutory schemes addressing antitrust and unfair or deceptive trade practices," and because "antitrust allegations do

not 'fit within the MCPA framework,'" courts in Maryland have held that anticompetitive conducts are not actionable under the MCPA.  See Washington Cnty. Bd. of Educ. v. Mallinckrodt ARD, Inc., 431 F. Supp. 3d 698, 711 (D. Md. 2020) (quoting Davidson v. Microsoft Corp., 143 Md. App. 43, 57 (2002)).  Accordingly, the Court allows the motion to dismiss as to consumer protection claims raised under Maryland law on this ground.

*Utah.*  "The Utah Consumer Sales Practices Act ("UCSPA") . . . prohibits deceptive or unconscionable acts or practices by a supplier in connection with a consumer transaction." Wade v. Jobe, 818 P.2d 1006, 1013-14 (Utah 1991).  (quoting Utah Code Ann. §§ 13-11-1 *et seq.*). Courts are split on whether the UCSPA applies in antitrust context.  Some, emphasizing the statute's requirement that the UCSPA be construed liberally, have held that the statute can be applied against antitrust violations.  See e.g.,  In re Cattle Antitrust Litig., No. 19-cv-1129-JRT-HB, 2021 WL 7757881, at *14 (D. Minn. Sept. 14, 2021) (citing Utah Code Ann. § 13-11-2); In re Namenda Indirect Purchaser Antitrust Litig., No. 115-cv-6549C-MRWL, 2021 WL 2403727, at *33 (S.D.N.Y. June 11, 2021).  Others, noting that the UCSPA was meant to be interpreted in accordance with the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, have held that the UCSPA cannot be applied to antitrust violations because the statute lacks an anticompetition provision similar to the FTCA.  See e.g.,  Iron Workers I, 734 F. Supp. 3d at 163 (citing Utah Code Ann. § 13-11-2(4)); In re Dynamic Random Access Memory (Dram) Antitrust Litig., 516 F. Supp. 2d 1072, 1117 (N.D. Cal. 2007) (citing Utah Code Ann. § 13-11-2(4)).  Here, the Court finds the latter cases' reasoning more persuasive.  Although the text of the UCSPA emphasizes that the statute is to be construed liberally, it also notes that the statute must be construed to "promote" specific policies, among which is to "make state regulations of consumer sales practices not inconsistent with the policies" of the FTCA.  Utah Code Ann. § 13-11-2(4).  Because the USCPA

was modelled after and is meant to be read in accordance with the FTCA, the lack of an anticompetition provision in the USCPA indicates that the legislature did not intend for such a provision to be read into the statute.  See Dynamic Random Access Memory, 516 F. Supp. 2d at 1117.  Accordingly, the Court allows the motion to dismiss as to consumer protection claims raised under Utah law.

### b.  New Jersey and Oklahoma

*New Jersey*.  Federal and state courts have previously held that the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. 56:8-1 *et seq*. prohibits indirect purchasers from pursuing antitrust actions, noting that doing so would undermine the NJAA's prohibition of same.  See In re New Motor Vehicles Canadian Exp. Antitrust Litig., 350 F. Supp. 2d 160, 195 (D. Me. 2004); Island Mortg. of New Jersey & Perennial Lawn Care, Inc. v. 3M, 860 A.2d 1013, 1017-18 (N.J. Super. 2004).  Given that the NJAA has been amended to allow indirect purchasers to bring antitrust actions, N.J. Stat. Ann. § 56:9-12(a)–(c), this reasoning is no longer persuasive.  Because "states remain free to permit recovery by indirect purchasers," Massachusetts Laborers may seek antitrust recovery under NJCFA "so long as [its] allegations are enough to plead the relevant consumer protection violation."  In re Generic Pharms. Pricing Antitrust Litig., 368 F. Supp. 3d 814, 840 (E.D. Pa. 2019) (citations omitted).  Accordingly, the Court denies the motion to dismiss Massachusetts Laborers' consumer protection claims raised under New Jersey law.

*Oklahoma*.  Courts generally agree that the Oklahoma Consumer Protection Act ("OCPA"), Okla. Stat. Ann. 15, § 751 *et seq*., does not permit indirect purchasers from bringing actions for antitrust violations.  See California v. Infineon Techs. AG, 531 F. Supp. 2d 1124, 1149 (N.D. Cal. 2007); Major v. Microsoft Corp., 60 P.3d 511, 517 (Okla. Civ. App. 2002).

34

Accordingly, the Court allows the motion to dismiss as to Massachusetts Laborers' consumer protection claims raised under Oklahoma law.

### c.  Massachusetts

Even assuming *arguendo* that a Chapter 93A § 11 claim survived the failure to allege conduct that occurred "primarily and substantially" in Massachusetts as required, <u>see</u> pp. 28-29, <u>supra</u>, Section 11 "includes a specific provision that in any action brought under that section, the court shall be guided in its interpretation of unfair methods of competition by the provisions of the [Massachusetts] Antitrust Act [Mass. Gen. L. c. 93]." <u>Ciardi v. F. Hoffmann-La Roche, Ltd.</u>, 436 Mass. 53, 62-63 (2002). Because "the Antitrust Act is to be construed in harmony with judicial interpretations of comparable federal antitrust statutes, the rule of law established in [<u>Illinois Brick</u>] would apply with equal force to preclude claims brought under G. L. c. 93 by indirect purchasers in Massachusetts." <u>Id.</u> at 57-58. Accordingly, the Court allows the motion to dismiss as to claims raised under Massachusetts consumer protection laws on this basis as well.

### d.  Indiana, Maryland, South Dakota, Vermont and Wyoming

*Indiana.* Under the Indiana Deceptive Consumer Sales Act ("IDCSA"), a person who "rel[ies] upon an uncured or incurable deceptive act may bring an action for the damages actually suffered." Ind. Code Ann. § 24-5-0.5-4(a). At issue is whether the IDCSA applies where Massachusetts Laborers did not directly rely upon Boehringer's alleged deception. In <u>In re Actiq Sales & Mktg. Pracs. Litig.</u>, the court held that a plaintiff may assert a claim under the IDCSA where there is no direct, first-party reliance. <u>In re Actiq Sales & Mktg. Pracs. Litig.</u>, 790 F. Supp. 2d 313, 322-24 (E.D. Pa. 2011). There, the plaintiffs, third-party payors, alleged that they were forced to pay excessive prescription costs for the defendant's drug due to the defendant's illegal marketing scheme directed at physicians. <u>Id.</u> at 317. The court explained that the statutory text

covers deceptive practices by "a supplier," which is defined as "a manufacturer, wholesaler, or retailer, whether or not the person deals directly with the consumer." Id. at 323 (quoting Ind. Code. Ann. §§ 24-5-0.5-2(a)(3)(A)). As such, the court held that "it is evident that the Indiana legislature intended the law to encompass deceptive acts that cause damages not only to direct consumers, but also third parties who would lack direct reliance on the supplier's deceptive acts." Id. Thus, "reasonable reliance will suffice, not only that of a first-party nature." Id. The Court finds the Actiq court's reasoning persuasive. Here, as alleged, Boehringer's Orange Book listing scheme and sham litigation have caused Massachusetts Laborers injury in the form of higher prices for purchases of Combivent Respimat and Spiriva Respimat. D. 57 ¶¶ 676, 685. Thus, Massachusetts Laborers may raise a claim under the IDCSA notwithstanding the lack of direct reliance on any of Boehringer's statements or conduct. Accordingly, the Court denies the motion to dismiss as to consumer protection claim raised under Indiana law.

*Maryland.* Even if anticompetitive conduct was actionable under the MCPA, see pp. 32-33, supra, Massachusetts Laborers have still failed to state a claim under the MCPA. To state such a claim, "a plaintiff must adequately plead that (1) the defendant engaged in an unfair or deceptive practice or misrepresentation, (2) the plaintiff relied upon the representation, and (3) doing so caused the plaintiff actual injury." Bowman v. Select Portfolio Servicing, Inc., 704 F. Supp. 3d 633, 652 (D. Md. 2023) (quoting Turner v. JPMorgan Chase, N.A., No. 14-cv-0576-TDC, 2015 WL 5021390, at *4 (D. Md. Aug. 21, 2015)). "A consumer relies on a misrepresentation when the misrepresentation substantially induces the consumer's choice." Bank of Am., N.A. v. Jill P. Mitchell Living Tr., 822 F. Supp. 2d 505, 532 (D. Md. 2011) (citations omitted). Because the reliance element of the MCPA requires a plaintiff to allege plausibly that its behavior was induced by the defendant's alleged misrepresentations, a plaintiff may only satisfy this element by alleging

direct reliance.  See In re ZF-TRW Airbag Control Units Prod. Liab. Litig., 601 F. Supp. 3d 625, 777 (C.D. Cal. 2022) (concluding that the plaintiffs have failed to show reliance because the plaintiffs "have not shown that they were exposed to or relied on [the defendants'] alleged misrepresentations"), opinion clarified sub nom. In re ZF-TRW Airbag Control Units Prod., No. 19-cv-02905-JAK, 2022 WL 19425927 (C.D. Cal. Mar. 2, 2022).  Here, although Massachusetts Laborers has plausibly alleged that it suffered an injury due to Boehringer's alleged anticompetitive conduct which as alleged include falsely certifying to the FDA that its listed patents claim a drug product, D. 57 ¶ 676, it failed to allege any facts to permit an inference that it directly relied upon that alleged misrepresentation to its detriment.  Accordingly, the Court allows the motion to dismiss as to consumer protection claims under Maryland law.

South Dakota.  The South Dakota Deceptive Trade Practices and Consumer Protection Act ("SDDTPA") provides that "*[a]ny person* who claims to have been adversely affected by any act of a practice declared to be unlawful by [the SDDTPA] shall be permitted to bring a civil action" for recovery of damages.  Moss v. Guttormson, 551 N.W.2d 14, 17 (S.D. 1996) (some alterations in original) (emphasis in original) (quoting S.D. Codified Law § 37-14-31).  Because the statute applies to any person who was adversely affected, its scope extends beyond direct consumers.  Id. Accordingly, "[d]efendants cannot escape liability to plaintiffs for their alleged misrepresentations simply because they did not make statements directly to plaintiffs."  Brookings Mun. Utilities, Inc. v. Amoco Chem. Co., 103 F. Supp. 2d 1169, 1178 (D.S.D. 2000).  Because Massachusetts Laborers has plausibly alleged that it suffered from Boehringer's alleged anticompetitive conducts, it may raise a claim under the SDDTPA.  According, the Court denies the motion to dismiss as to consumer protection claims under South Dakota law.

*Vermont.*  The Vermont Consumer Protection Act ("VCPA") provides that "[a]ny consumer who contracts for goods or services in reliance upon false or fraudulent representations or practices prohibited . . . , or who sustain damages or injury as a result of any false or fraudulent representations or practices prohibited . . . may sue for appropriate equitable relief and may recover . . . the amount of his or her damages."  Vt. Stat. Ann. Tit. 9, § 2461(b). "To maintain a private action under § 2461(b), a plaintiff must '[allege plausibly] either (1) reliance on a deceptive act in contracting goods or services or (2) damages or injury from an unfair or deceptive act." Mansfield v. Heilmann, Ekman, Cooley & Gagnon, Inc., 308 A.3d 533, 543 (Vt. 2023) (quoting Dernier v. Mortg. Network, Inc., 87 A.3d 465, 481 (Vt. 2013)).  Thus, so long as Massachusetts Laborers could allege some injury resulting from Boehringer's alleged unlawful conduct, it needs not to also allege reliance.  See id. (quoting Dernier, 87 A.3d at 481).  As discussed, Massachusetts Laborers has done so here.  Accordingly, Massachusetts Laborers has stated a claim under the VCPA and the Court denies the motion to dismiss as to consumer protection claims raised under Vermont law.

*Wyoming.*  The Wyoming Consumer Protection Act ("WYCPA") provides that "[a] person relying upon an uncured unlawful deceptive trade practice may bring an action under this act for the damages he has actually suffered as a consumer as a result of such unlawful deceptive trade practice."  Wyo. Stat. Ann. § 40–12–108(a).  At least one court has indicated that the statute requires an allegation of direct reliance.  See Allen v. Conagra Foods, Inc., 331 F.R.D. 641, 669 (N.D. Cal. 2019) (observing that the plaintiffs "acknowledge[d] that the statute explicitly requires reliance").  The Court agrees with this assessment.  By its plain terms the statute limits its scope to only persons "relying upon" unlawful and deceptive trade practices "for the damages he has actually suffered."  Wyo. Stat. Ann. § 40–12–108(a).  Here, Massachusetts Laborers has not

alleged that it directly relied upon any of Boehringer's alleged misconducts to its detriment. Accordingly, the Court allows the motion to dismiss as to consumer protection claims raised under Wyoming law.

### 3.    Unjust enrichment claims

In general, "there are only a few differences in the description of unjust enrichment claims as between states." Iron Workers I, 734 F. Supp. 3d at 161 (quoting Overka v. Am. Airlines, Inc., 265 F.R.D. 14, 21 (D. Mass. 2010)). "First, each state requires enrichment of the defendant at the expense of plaintiff." Overka, 265 F.R.D. at 21. "Second, all states require that the defendant retain the benefit." Id. "Third, all jurisdictions require that retention of the benefit without payment would create injustice." Id. Boehringer argues that Massachusetts Laborers has failed to state a claim for unjust enrichment the laws of Alabama, Florida, New York, North Carolina, Michigan, North Dakota and Ohio because it has failed to allege plausibly that it has conferred a direct benefit to Boehringer, which. D. 66 at 26.

### a.   Alabama

"In Alabama, 'the essence of . . . unjust enrichment . . . is that a plaintiff can prove facts showing that defendant *holds* money which, in equity and good conscience, belongs to plaintiff or *holds* money which was improperly paid to defendant because of mistake of fraud.'" Danny Lynn Elec. & Plumbing, LLC v. Veolia ES Solid Waste Se., Inc., No. 09-cv-192-MHT, 2011 WL 2893629, at *6 (M.D. Ala. July 19, 2011) (emphasis in original) (alterations in original) (quoting Hancock–Hazlett General Const. Co., Inc. v. Trane Co., 499 So.2d 1385, 1387 (Ala.1986)). Courts have generally agreed that Alabama law requires a plaintiff to have conferred a direct benefit to the defendant to state a claim for unjust enrichment. See e.g. In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig., No. 13-cv-MD-2495-TWT, 2018 WL 2929831, at *6

(N.D. Ga. June 8, 2018) (quoting Opelika Prod. Credit Ass'n, Inc. v. Lamb, 361 So. 2d 95, 99 (Ala. 1978)) (concluding that unjust enrichment under Alabama law requires that the benefit conferred "must be realized as a direct result of the transaction"); Danny Lynn, 2011 WL 2893629, at *6 (M.D. Ala. July 19, 2011) (dismissing plaintiffs' unjust enrichment claim under Alabama law because the plaintiffs "did not confer a direct benefit" on the individual defendants"). Because Massachusetts Laborers has not alleged plausibly a direct conferral of benefits, the Court allows the motion to dismiss as to the unjust enrichment claim under Alabama law.

### b. Florida

Courts in Florida have held that to prevail on an unjust enrichment claim, the plaintiff must have conferred a direct benefit to the defendant. See Kopel v. Kopel, 229 So. 3d 812, 818 (Fla. 2017) (citing Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla. N.A., 667 So.2d 876, 879 (Fla. 3d DCA 1996)); Cape, LLC v. Och-Ziff Real Est. Acquisitions LP, 370 So. 3d 1010, 1016 (Fla. Dist. Ct. App. 2023) (citing Am. Safety Ins. Serv., Inc. v. Griggs, 959 So. 2d 322, 331 (Fla. 5th DCA 2007)). "A direct benefit is not conferred on a manufacturer where a consumer buys a product from a retailer, rather than directly from the manufacturer." In re Evenflo Co., Inc. Mktg., Sales Pracs. & Prod. Liab. Litig., 707 F. Supp. 3d 103, 136 (D. Mass. 2023) (citing Marrache v. Bacardi U.S.A., Inc., 17 F.4th 1084, 1102 (11th Cir. 2021)). Here, Massachusetts Laborers alleges that it "purchased, paid, and/or provided reimbursement for some or all of the purchase price of Combivent Respimat and Spiriva Respimat" for its members "from pharmacies in multiple states." D. 57 ¶ 21. Because Massachusetts Laborers has not alleged that it purchased the medications directly from Boehringer, the Court allows the motion to dismiss as to the unjust enrichment claim under Florida law.

### c. New York

To state a claim for unjust enrichment under New York law, "'a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment,' but their relationship cannot be 'too attenuated.'" In re Processed Egg Prods. Antitrust Litig., 851 F. Supp. 2d 867, 930 (E.D. Pa. 2012) (quoting Sperry v. Crompton Corp., 8 N.Y.3d 204, 215–16 (2007)). At least one federal court has explained that this means "a product's indirect purchaser" can assert the claim "against the manufacturer of the product itself." Waldman v. New Chapter, Inc., 714 F. Supp. 2d 398, 403-04 (E.D.N.Y. 2010) (citing Cox v. Microsoft Corp., 778 N.Y.S.2d 147, 149 (1st Dep't 2004)). Thus, Massachusetts Laborers may assert this unjust enrichment claim against Boehringer here without needing to allege plausibly that it had conferred a direct benefit on Boehringer. See Processed Egg Prods., 851 F. Supp. 2d at 930 (holding that the complaint's lack of allegations "suggesting the conferral of a direct benefit . . . is not in and of itself fatal to a New York unjust enrichment claim as a matter of law"). Accordingly, the Court denies the motion to dismiss as to the unjust enrichment claim under New York law.

### d. North Carolina

"North Carolina law requires that a plaintiff seeking recovery for unjust enrichment 'must have conferred a benefit on the other party.'" Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 F. App'x 916, 920 (4th Cir. 2003) (quoting Booe v. Shadrick, 322 N.C. 567, 556 (1988)). "Under North Carolina law, it is sufficient for a plaintiff to [allege plausibly] that it has conferred some benefit on the defendant, without regard to the directness of the transaction." Id. at 921. Because North Carolina law does not impose a "direct benefit" requirement, the Court denies the motion to dismiss as to the unjust enrichment claim under North Carolina law.

### e. Michigan

In Michigan, unjust enrichment is only available "in cases where the defendant directly receives a benefit from the plaintiff." Smith v. Glenmark Generics, Inc., USA, No. 315898, 2014 WL 4087968, at *1 (Mich. Ct. App. Aug. 19, 2014) (citing Kammer Asphalt Paving Co. v. E. China Twp. Sch., 443 Mich. 176, 187–88 (1993)). Thus, the Michigan Court of Appeals has held that unjust enrichment is unavailable where the plaintiff and defendant have no direct contact with one another. See A & M Supply Co. v. Microsoft Corp., No. 274164, 2008 WL 540883, at *2 (Mich. Ct. App. Feb. 28, 2008). Here, Massachusetts Laborers does not allege that it has had any direct contacts or transactions with Boehringer. Accordingly, the Court allows the motion to dismiss as to the unjust enrichment claim under Michigan law.

### f. North Dakota

Under North Dakota law, "[f]or a complainant to recover" for unjust enrichment, "it is sufficient if another 'has, without justification, obtained a benefit at the direct expense of the complainant, who then has no legal means of retrieving it. . . . The essential element in recovering under the theory of unjust enrichment is the receipt of a benefit by the defendant from the plaintiff which would be inequitable to retain without paying for its value." McColl Farms, LLC v. Pflaum, 837 N.W.2d 359, 367 (N.D. 2013) (internal citation and quotation marks omitted). Courts in this Circuit have generally held that a plaintiff must allege plausibly the conferral of a direct benefit to the defendant to state a claim for unjust enrichment under North Dakota law. See Amitiza, 2024 WL 4250224, at *34-35 (citations omitted); In re Loestrin 24 FE Antitrust Litig., 410 F. Supp. 3d 352, 384 (D.R.I. 2019) (citing Solodyn, 2015 WL 5458570, at *18). Here, because Massachusetts Laborers has not alleged any conferral of direct benefits to Boehringer and accordingly the Court allows the motion to dismiss as to the unjust enrichment claim under North Dakota law.

42

### g. Ohio

Under Ohio law, a plaintiff must allege plausibly that they have conferred a benefit directly to the defendant to state a claim for unjust enrichment.  See In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig., 684 F. Supp. 2d 942, 951-52 (N.D. Ohio 2009).  Therefore, "an indirect purchaser cannot assert a common law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser."  Johnson v. Microsoft Corp., 834 N.E.2d 791, 799 (Ohio 2005).  Accordingly, the Court allows the motion to dismiss as to the unjust enrichment claim under Ohio law.

### D.    Injunctive Relief Claim Pursuant to the Clayton Act, 15 U.S.C. § 26

Under the Clayton Act,[8] "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.  "In other words, plaintiffs 'must [allege plausibly] a significant threat of injury from an impending violation . . . or from a contemporary violation likely to continue or recur."  In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 209 (S.D.N.Y. 2012) (quoting In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 13 (1st Cir. 2008)).  Such an injury must be "both 'real and immediate,' not 'conjectural' or 'hypothetical.'"  New Motor Vehicles, 522 F.3d at 14 (quoting O'Shea v. Littleton, 414 U.S. 488, 494 (1974)).

---

[8] Although Massachusetts Laborers references both the Sherman Act and the Clayton Act in the heading of Count 15, it only "requests that the Court grant injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26."  D. 57 ¶ 836.  Accordingly, the Court construes this claim as requesting injunctive relief only under the Clayton Act.

Boehringer argues that the Court should dismiss this claim because Massachusetts Laborers has "failed to allege a 'real and immediate' threat of injury requiring injunctive relief. D. 78 at 16 (citing New Motor Vehicles, 522 F.3d at 14). But Massachusetts Laborers' alleged injury, having to pay higher prices for drugs it otherwise would not need to but for Boehringer's allegedly wrongful listing, D. 57 ¶ 685, is the precisely the kind of "[t]hreaten[ed] economic harm to . . . consumers . . . [that] is plainly sufficient to authorize injunctive relief." New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 661 (2d Cir. 2015) (some alterations in original) (quoting California v. Am. Stores Co., 495 U.S. 271, 283 (1990)). Accordingly, the Court denies the motion to dismiss as to Massachusetts Laborers' claim for injunctive relief on this ground.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS in part and DENIES in part Boehringer's motion to dismiss, D. 65, as follows:

1.  The motion to dismiss is ALLOWED with respect to Massachusetts Laborers' sham litigation claims.

2.  The motion to dismiss is ALLOWED with respect to Massachusetts Laborers' antitrust claims (monopolization and attempted monopolization) raised under Illinois, Massachusetts, Mississippi and Utah laws.

3.  The motion to dismiss is ALLOWED with respect to Massachusetts Laborers' consumer protection claims raised under Arkansas, Illinois, Maryland, Utah, Oklahoma, Massachusetts and Wyoming laws.

4.  The motion to dismiss is ALLOWED with respect to Massachusetts Laborers' unjust enrichment claims raised under the laws of Alabama, Florida, Michigan, North Dakota and Ohio.

5. The motion to dismiss is DENIED in all other respects.  The remaining claims are as follow:

    a.  Counts 1, 2, 4, 8, 9 and 11 excluding claims raised under Illinois, Massachusetts, Mississippi and Utah laws.

    b.  Counts 5, 6, 12 and 13 excluding claims raised under Arkansas, Illinois, Maryland, Utah, Oklahoma, Massachusetts and Wyoming laws.

    c.  Counts 15, the claim for injunctive relief under § 16 of the Clayton Act.

    d.  Count 16 excluding claims raised under Alabama, Florida, Michigan, North Dakota and Ohio laws.

**So Ordered.**

/s Denise J. Casper
United States District Judge